STATE OF SOUTH CAROLINA v. SCHEPER.[1]

1. No exceptions having been taken to an order overruling an oral demurrer to the complaint, within time either after such order or after final judgment for plaintiff, the appellant is not entitled, on the hearing of his appeal, to an order, on motion duly noticed, permitting exceptions to such order, even though such order has been incorporated into the Brief by direction of the Circuit Judge on the settlement of the case.

-------

[1] This case and the one next following it were heard while Chief Justice Simpson was on the bench, but were decided after his death by the two surviving justices.—REPORTER.

2. Where an original complaint is read in defendant's hearing, who then interposed an oral demurrer, which was overruled and defendant given time to answer, and the answer is filed, the objection that the copy complaint served was not a true copy of the original, comes too late on the call of the cause for trial.

3. The law requires phosphate royalty to the State to be paid "upon each and every ton of the crude rock and not of the rock after it has been steamed or dried." In suit on a bond given to secure the payment of such royalty, the copy complaint correctly alleged the condition of the bond to be that the licensee should pay "the royalty provided by law to be paid thereon," but it further alleged that such royalty was "one dollar upon each and every ton to be estimated only on the crude rock after it has been steamed or dried," whereas the condition of the bond and the original complaint read: "one dollar upon each and every ton to be estimated only on the crude rock *and not* after it has been steamed or dried." *Held,* in the absence of any showing that defendants had been misled by the clerical omission of the words "and not" in the copy complaint that such omission did not furnish ground for a non-suit.

4. The question of the relevancy of testimony is necessarily left very much to the judgment of the trial judge.

5. The condition of a bond was that the principal should pay the royalty on phosphate rock and phosphatic deposits "dug, mined, and removed and shipped or otherwise sent to market." *It would seem* that assignment of breaches alleging a failure to pay the royalty on rock "dug, mined, and removed by them" was sufficient. But as the complaint further alleged, in another paragraph, that the principal had failed to make returns "of the number of tons of phosphate rock and phosphatic deposit by them dug, mined, removed, *or* shipped or otherwise sent to market at the end of each month, and that they did not pay to the State treasurer at the end of each quarter the royalty provided by law to be paid thereon," a good breach was assigned and evidence of such failure to pay was relevant, and prevented a non-suit.

6. Declarations and admissions of the principal, made in the course of the business for which the surety is bound, so as to become a part of the *res gestae,* are admissible in evidence against the surety.

7. A license to dig phosphates in the territory of the State was subject to the right of the Department of Agriculture to revoke the license, if the royalty was not promptly paid. The bond of the licensee required the royalty to be paid quarterly. *Held,* that a failure to revoke the license upon non-payment of the royalty when due, did not discharge the sureties on the bond. Mere indulgence to the principal will not discharge a surety, and within the penalty of a bond, the surety is liable for all the shortcomings and defalcations of the principal.

8. Petition for rehearing refused.

Before HUDSON, J., Beaufort, February, 1890.

This was an action by the State of South Carolina against F. W. Scheper and John F. Huchting, sureties on the bond of W. T. Seward & Co., commenced in August, 1888. The license to mine was as follows:

STATE OF SOUTH CAROLINA,    
Department of Agriculture.

To all whom these presents may concern, greeting: Whereas application has been made to the Department of Agriculture by W. T. Seward & Co., a citizen, body corporate, of the said State, for a license granting a general right to dig and mine phosphate rock and phosphatic deposits from Broad, Beaufort, Johnson, and Morgan Rivers, Parrott and Battery Creeks and tributaries, being part of the navigable streams and waters of the State not now occupied by companies having exclusive rights therein in accordance with the laws of said State, in such case made and provided, and the rules and regulations of the said Department of Agriculture made in pursuance thereof. Now know ye, that in pursuance of the said laws, rules, and regulations, the said Department of Agriculture do hereby license the said W. T. Seward & Co., granting unto the said W. T. Seward & Co. a general right to dig and mine phosphate rock and phosphatic deposits in the following streams and waters of the State not now occupied by companies having exclusive rights therein, to wit: Broad, Beaufort, Johnson, and Morgan Rivers, Parrott and Battery Creeks and tributaries, subject, nevertheless, to the requirements, terms, and conditions prescribed and imposed by and expressed in the said laws of the State, and the rules and regulations of the Department of Agriculture hereon endorsed; and all such other laws, rules, and regulations as have been and shall hereafter be enacted, made, and prescribed in relation thereto. This license is for the term of one year from date thereof, renewable at the pleasure of the Department of Agriculture.

In witness whereof, the said Department of Agriculture has caused the seal of said department to be annexed to, and this license to be signed by A. P. Butler, the commissioner of agriculture, at Columbia, this second day of May, Anno Domini 1887.

                              A. P. BUTLER,
[SEAL.]                        Commissioner of Agriculture.
Witness: L. A. RANSOM.

ENDORSEMENT ON BACK OF LICENSE.

Rules and regulations of the Department of Agriculture for the

protection and management of the rights and interests of the State in the phosphate rocks and phosphatic deposits in the navigable streams and waters of the State.

RULE I.—All persons, companies, or firms holding phosphate licenses from the Board of Agriculture are forbidden from subletting the same.

RULE II.—No person, companies, or firms shall be granted or hold general rights and exclusive rights at the same time.

RULE III.—The Board of Agriculture will not grant license to any person, company, or firm now engaged or intending to engage in the mining of land rock.

RULE IV.—All persons, companies, or firms who shall apply for phosphate license shall designate the stream or portion of stream or streams in which they propose to mine, and shall not change their location without permission from the commissioner of agriculture.

RULE V.—No person, companies, or firms holding licenses from the Board of Agriculture shall be allowed to traffic or barter in phosphate rock other than that mined by themselves while holding such license.

RULE VI.—In all cases where phosphate royalties not promptly paid in the time prescribed by law, the license shall be suspended, and any mining done under the same after such suspension shall be considered and treated as illegal.

RULE VII.--Whenever suspension occurs under the foregoing rule, parties cannot resume their operations until royalty has been paid, and the same certified to the commissioner and his permission obtained.

RULE VIII.—Each flat engaged in the work shall be conspicuously marked with the name of the person or company working it, and be numbered in regular and continuing sequence with the other flats of the person or company licensed. Each lighter and dredge shall be likewise marked and numbered in a separate series of its class.

RULE IX.—Each captain of a flat, dredge, or lighter shall be furnished by the person or body corporate in whose employment he is, with a certificate of said employment, giving his name and number of the flats, lighters, and dredges under his charge, also stating the particular stream or streams in which he or they have been licensed to mine for the time being. This certificate, which the captain shall have with him at all times when at work, must be countersigned by the commissioner of agriculture or the special assistant.

RULE X.—Persons and bodies corporate licensed shall report monthly to the special assistant the dredges, flats, and lighters,

with the captains thereof, and the location in which engaged, that they have at work on the first .Wednesday of each month, and any increase or decrease of the number before the next monthly report.

The charge to the jury was as follows:

*Gentlemen of the Jury:* I'll submit this case to you, although it is late, because I don't think you will be detained long in deciding it. You have nothing to do but to decide the question of fact, and you take the law as I give it to you; and so far as the facts are concerned, there is no conflict of testimony, because there is no testimony introduced by the defence except simply the license. Now, it is conceded by the defence that they became the sureties upon the bond, the five thousand dollars bond for this phosphate company. That bond is set forth and admitted; their bond for whatever royalty they had failed to pay the State.

Inasmuch as I am requested to charge you by the defendants' counsel that the terms on the back of the license were confined to a single quarter, I will charge you on that point, and I charge you that that is not the law as I conceive it. But the sureties are responsible for the amount due the State by the principal, provided that amount does not exceed a special amount. Now, according to the returns in evidence submitted here, there would be, by the treasurer's certificate, seven thousand seven hundred and seventy odd dollars due. They cannot recover but five thousand, because that is the agreement of the bond. According to the returns of the comptroller general and the additional testimony of Mr. Roche, it would run over six thousand dollars, but they cannot recover over five thousand, because that is the amount of the bond.

Now, this testimony is undisputed, but all I can do is to instruct you as to the law, and I instruct you that the liability under the bond is to the extent of the royalty due, but not beyond the extent of the bond, $5,000; but they are liable to the extent of the bond, and all short comings and defalcations of the principal. We all get in these troubles through life when we sign bonds and so forth. Therefore if this undisputed testimony (and you are bound to take it, unless you have some very valid reason

not to believe it) shows that there is as much as five thousand dollars due, you will find to that amount. The undisputed testimony (if you believe it) shows that there is more than that, but you can't go beyond five thousand dollars. They claimed that the royalty was to be paid on the steamed and dried, and the testimony is that the loss is five per cent. Now, take that off, it still would not bring it down to five thousand; five per cent. of $7,770 does not bring it down to five thousand.

According to the evidence, it will reach the five thousand dollars. So, now, you will take the record and find your verdict. If you find for the plaintiff the five thousand dollars, if you are satisfied from the evidence that the full amount is due, you will say, "We find for the plaintiff five thousand dollars." If you find for the defendants, you will simply say, "We find for the defence."

Verdict was for plaintiff for $5,000, and defendants appealed upon the following exceptions:

1. That his honor, the presiding judge, erred in requiring defendants to go to trial on a complaint different from the copy served upon them.

2. That the complaint on which trial was had differed materially from the copy served upon the defendants, and that his honor erred in requiring defendants to go to trial upon that complaint.

3. That his honor erred in compelling defendants to submit to trial on a complaint which had not been served upon them.

4. That his honor erred in allowing plaintiff to proceed on the bond set out in the complaint, while the alleged copy served on the defendants set up a different bond.

5. That his honor erred while holding that the admissions of the defendants' answer were limited to the allegations contained in the alleged copy of the complaint served on them in ruling that no proof of the bond as alleged in the complaint was necessary, and that defendants were bound as to it, by their admissions as to the alleged bond in the copies of complaint served on them; the two bonds differing materially.

6. That his honor erred in admitting in evidence the statement from the State treasurer's books under the treasurer's certificate,

there being no connection shown with this transaction, and no evidence to identify it with the cause of action against the defendants alleged in the complaint; and further, because the State treasurer not being authorized or required to keep an account of unpaid phosphate royalty, the books themselves of the State treasurer would be incompetent in themselves to prove an indebtedness on such account, and the statement under certificate could prove no more than the books themselves.

7. That his honor erred in holding the statement from the State treasurer's books was admissible in evidence as admissions of the defendants' principal, W. T. Seward & Co., and binding on the defendants.

8. That his honor erred in admitting the returns of W. T. Seward & Co. to the comptroller general, as evidence to prove that any phosphate rock or phosphatic deposits had been "dug, mined, and removed and shipped or otherwise sent to market," because there was no allegation in the complaint that any phosphate rock or phosphatic deposits had been "dug, mined, and removed and shipped or otherwise sent to market."

9. That his honor erred in admitting the returns of W. T. Seward & Co. to the comptroller general as evidence to prove the amount of royalty due; the amount of phosphate rock and phosphatic deposits on hand at the beginning and ending of each month, because the bond was not conditioned for making such return.

10. That his honor erred in admitting the returns of W. T. Seward & Co. to the comptroller general as evidence, because they were irrelevant to the issue: the complaint not alleging that any phosphate rock or phosphatic deposits had been "dug, mined, and removed and shipped or otherwise sent to market."

11. That his honor erred in admitting the testimony of E. L. Roche to prove no returns were made by W. T. Seward & Co. to the comptroller general during the months of April and May, 1888. Because the law requiring the returns to be made to the comptroller general, Roche, being the agent of the Department of Agriculture, could not know whether such returns were made or not. Because Roche testified that the license of W. T. Seward & Co. was suspended on April 10th, and that they did not mine

after that date, therefore no returns could be made, and the testimony was irrelevant.

12. That his honor erred in charging the jury that the bond set forth in the complaint was admitted by the defendants.

13. That his honor erred in charging the jury that the terms on the back of the license did not confine the liability of the defendants to a single quarter, and that the defendants were liable to the State for the amount due by their principal, provided that amount did not exceed a special amount. While it is respectfully submitted that the conditions of the license, and rules and regulations of the Department of Agricultuae endorsed thereon, formed part of the contract between the State and defendants as sureties, and limit the liability of the defendants as sureties to the first quarter in arrear.

14. That his honor erred in refusing to grant a non-suit on defendants' motion. Because there was no evidence upon which the case could have properly gone to the jury, for if the case was tried upon the complaint produced by the plaintiff, and the alleged copies served upon the defendants not being copies of that complaint, no testimony was admissible to prove the allegations of that complaint; and further, because there was no evidence of any character or complexion of the making of the bond alleged in that complaint. And if such an absurdity can be presumed as that the cause was tried upon the copies served on the defendants, while the plaintiff was proceeding on a different complaint, then the copies having assigned no breach of the bond, as set forth in said copies, there could be no proof of the breach not alleged.

15. That his honor erred in holding, and so ruling, that no proof of the bond was necessary, that it was dispensed with by the admissions of defendants' answer, though it had been shown that the bond sued on and set forth in the complaint was materially different in its conditions from the bond set forth in the copies served on the defendants.

On the first call of the docket of the Second Circuit at the April term of 1890, defendants, after due notice, moved for leave to file additional exceptions so as to bring before this court the

correctness of the order of Judge Norton overruling an oral demurrer interposed by defendants to the complaint, alleging in their affidavit in support of the motion that they had not incorporated such order in their proposed Case, but as Judge Hudson in the settlement of the Case had ordered it to be incorporated on plaintiff's motion, and as the time for taking further exceptions had then expired, they asked for an order from this court permitting them now to take the exceptions, which were fully set out in their notice of this motion.

This motion was refused May 28, 1890, the court saying:

Exceptions may be taken to an interlocutory order when it is filed, or within the proper time after final judgment rendered. The exceptions now proposed were not taken at either of these times. It is too late to have them inserted in the record, the case having been made up and being now ready for hearing in this court.

*Messrs. Elliott & Townsend* and *W. J. Verdier*, for appellants.

*Mr. Joseph H. Earle*, Attorney General, contra.

January 6, 1891. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. In May, 1887, the department of agriculture of the State granted to W. T. Seward & Co., a body corporate, a license to dig and mine phosphate rocks and phosphatic deposits in certain navigable waters of the State; subject to the requirements, terms, and conditions provided by and expressed in the laws of the State and the rules of the department of agriculture. (See the license and the rules in the case.) The defendants, with Seward & Co., the licensees, executed a joint and several bond to the State in the penalty of $5,000, conditioned "that the said W. T. Seward & Co. shall make true and faithful returns to the comptroller general of the number of tons of phosphate rocks and phosphatic deposits by the said W. T. Seward & Co. dug, mined, and removed and shipped or otherwise sent to market, at the end of every month, and shall punctually pay to the State treasurer at the end of every quarter or three months

the royalty provided by law to be paid thereon, to wit, one dollar upon each and every ton, to be estimated only on the crude rock, and not upon rock after it has been steamed or dried; the first quarter to commence to run on the first day of January in each year; then the above obligation to be void and of none effect, otherwise to remain in full force and virtue," &c.

It seems that the said Seward & Co. went immediately to mining and made "returns" of the number of tons mined and removed, by what conveyance, and the amount due the State in money therefor, for the months of September, October, November, and December of 1887, and of January, February, and March of 1888. But as it appeared from the records of the treasurer's office, that Seward & Co. were largely in arrears of dues to the State, viz., $7,764.36, the department of agriculture revoked their license to mine about the middle of April, 1888, and soon thereafter brought this action on the bond in the name and for the benefit of the State. The bond itself was not before the court, but the third paragraph of the complaint set out the condition in the terms above set forth, and then proceeded, in a number of paragraphs, to assign breaches of the bond, as follows:

"Paragraph 4. That the said W. T. Seward & Co., under and by virtue of said license, dug, mined, and removed large quantities of phosphate rocks and phosphatic deposits from the navigable streams and waters of the State.

"Paragraph 5. That the condition of said bond has been broken; that the said W. T. Seward & Co. did *not* make true and lawful returns to the comptroller general of the number of tons of phosphate rocks and phosphatic deposits by them dug, mined, removed or shipped, or otherwise sent to market at the end of each month, and that they did *not* pay to the State treasurer at the end of every quarter or three months the royalty provided by law to be paid thereon."

Paragraphs 6, 7, 8, 9, 10, 11, and 12 assign breaches for the different months named, in the words following: "That. W. T. Seward & Co. did not pay the royalty provided by law to be paid by them on phosphate rocks and phosphatic deposits, dug, mined, and removed by them, as required by said bond," &c.

Paragraph 13 assigned as a breach "that the said W. T. Sew-

ard & Co. failed and neglected to make returns to the comptroller general of the number of tons of phosphate rocks and phosphatic deposits dug, mined, or removed by them during the months of April and May, 1888; and that the said W. T. Seward & Co. did *not* pay to the State treasurer at the end of the current quarter the royalty provided by law to be paid, &c.; and that the said W. T. Seward & Co. are now indebted unto the said plaintiff in the sum of $2,936.53 on account of royalty due by them for said months on phosphate rocks, &c., dug, mined, and removed by them, and for which they have made no returns as aforesaid," &c.

"Paragraph 14. That the defendants are indebted to the plaintiff upon the said bond, by reason of the breaches of the condition thereof as hereinbefore assigned, in the sum of $5,000; that payment has been demanded of the defendants, but they have refused to pay the same," &c.

At the September term of the court (1888), the complaint having been read, the defendants, without making any particular objections to the pleadings or alleged discrepancies, moved to dismiss the complaint on the ground that it "did not state facts sufficient to constitute a cause of action." Judge Norton overruled the motion, but gave the defendants twenty days to answer. They availed themselves of this privilege, and answered as follows: "I. That they admit as true the allegations made in the first *three paragraphs of the complaint.* II. That they have no knowledge or information sufficient to form a belief as to the truth of the allegations made in the fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth paragraphs of said complaint, &c. III. That they have no knowledge or information sufficient to form a belief as to the truth of the allegation made in the fourteenth paragraph of the complaint, that these defendants are indebted to the plaintiff upon their bond, by reason of the breaches of the conditions thereof assigned in the said complaint, and therefore they deny said allegations, but admit the other allegations of said paragraph of demand and refusal of payment," &c.

Upon these pleadings the case came on again for trial before Judge Hudson and a jury. After the trial commenced, Mr. Verdier,

for the defendants, called the attention of the court to the fact that there were some discrepancies between the complaint filed and the copy served upon the defendants, the alleged copy not being in all respects a perfect copy. The court said : "The bond must speak for itself. If there should be any little error in the recital of the bond, I don't think it would be fatal." Mr. Verdier called attention to the fifth paragraph, 4th and 5th line from the bottom, where the attorney general read "and" where the alleged copy has the word "or," and therefore he objected to the reading of the complaint. (Overruled and exception taken.) The attorney general then offered the evidence for the State, consisting first of the sworn returns of Seward & Co. for seven months. (For specimen return, September, 1887, see following page.)

Mr. Verdier, for the defendants, objected to the competency of this testimony, but the judge ruled that the written acknowledgments of the principal were binding upon the sureties.

Mr. E. L. Roche, an officer of the department of agriculture, was sworn, who testified that Seward & Co. made no returns for the months of April and May (1888), and that at that time they had on hand of phosphate rocks mined under the license and afterwards disposed of at least 2,000 tons, worth $2,000, or more— "estimated," as was the universal practice according to law, "only on the crude rock ;" the difference being 5 per cent. between that and dried rock. (Mr. Verdier objects to this testimony as irrelevant.)

The defendants offered no testimony, except formal proof of the license, but moved for a non-suit, "on the ground that the State had not made out its case. There is no allegation that we have 'shipped' one ton of rock. They must prove that we have 'mined,' dug, and shipped or sent to market the rock. The royalty is only payable when the rock has been dug, mined, and shipped," &c. The judge refused the motion and sent the case to the jury, which found a verdict for the State for $5,000, the penalty of the bond.

The defendants appealed, filing fifteen exceptions, which, being long and printed in "the record," need not be set out here. There is no appeal from Judge Norton's order refusing to dismiss the

STATE OF SOUTH CAROLINA.

Return of Phosphate Rock Mined or Removed from the Beds of Navigable Streams within the Jurisdiction of the State of South Carolina during the Month of September, 1887, by W. T. Seward & Co.

| EXHIBIT A. | Number Tons. | DISPOSITION MADE OF ROCK REMOVED DURING THE MONTH. | | | | | | Royalty due State on Month's Work. |
|---|---|---|---|---|---|---|---|---|
| | | Date. | Number of Tons. | By What Conveyance. | Captain of Vessel. | Consignee or Purchaser. | Destination. | |
| On hand on the first day of month. . . . . | 3,027 | | | | | | | |
| Mined during the month, . . | 517 | | | | | | | |
| Removed during the month. | 868 | | 468 400 | Railroad Lighter to Savannah. | | Hammond, Hull & Co., J. Plarher-ton & Co. | Factory, Liverpool. | 911.40 |
| On hand the last day of the month. . . . . | 2,676 | | | | | | | |
| Note.—Actual weight of rock removed must be given—other quantities may be estimated. | | | | | | | | |
| Places of deposit of rock on hand at the end of the month. Wharf Battery Creek. | | | | | | | | |
| From what localities mined during the month. Johnson and Beaufort Rivers. | | | | | | | | |

Personally appeared before me on this fourth day of October, 1887, W. T. Seward, who, on his oath, says that the facts stated in the foregoing return are true.

CHAS. A. LENGNICK, Notary Public. [SEAL.]

I certify that the above return is true.

W. T. SEWARD.

complaint at a previous term of the court. The defendants did not plead performance or offer any evidence, so that the only question in the case is whether there was error in refusing the non-suit on account of the alleged discrepancies between the complaint filed and the copy served on the defendants, which discrepancies were first brought to the attention of the court during the progress of the trial. The matter is certainly out of the usual course, and, for the sake of clearness, we think the exceptions may be condensed, substantially, into the three following propositions, which we will now proceed to consider:

"First. That the judge erred in holding that no proof of the bond was necessary, as it was dispensed with by the admissions of the answer, although it was shown that the bond set forth in the complaint was, in its condition, materially different from that stated in the copy served on the defendants." It does not appear that the copy of the complaint showing the alleged discrepancy was offered in evidence, but assuming that it was before the court, the third paragraph of the complaint set out the condition of the bond as stated above, and the first paragraph of the answer "admitted as true the allegations made in the first three paragraphs of the complaint." Why, was that not an admission of the condition of the bond, which dispensed with further proof of it? The defendants had seen the original complaint, when, at a previous term of the court, the motion was made before Judge Norton to dismiss it, and if they intended to object to any alleged discrepancies in the copy, *then* was the proper time to have done so, when necessary correction could have been made. But that was not done, the defendants did not disclose the discrepancy, but afterwards answered to the merits, which, as it seems to me, was a waiver of the objection. See *Waldrop* v. *Leonard*, 22 S. C., 121.

But if the defendants had the right to stand upon the precise phraseology of the copy served, notwithstanding their knowledge of the terms of the bond as contained in the complaint filed, we do not think that the condition of the bond stated in the copy was, in meaning and effect, "materially different" from that in the complaint filed. The discrepancy complained of was manifestly a clerical error of the copyist, being the omission of the

words "and not" in the 5th line from the bottom of the third paragraph of the copy. In the complaint the sentence reads, "one dollar upon each and every ton, to be estimated only on the crude rock, and not upon rock after it has been steamed or dried;" while the copy reads, "one dollar upon each and every ton, to be estimated only on the crude rock [and not] after it has been steamed or dried." It is manifest that the purpose was to express the idea that the estimate was to be only on the crude rock, known to be the express requirement of the law. The first part of the sentence expressed it affirmatively, and the second part was merely intended to express the same thing negatively. The omission of the words "and not" may make the whole paragraph somewhat confused and less clear, but there can be no doubt as to the meaning with or without the omitted words. In both readings the positive declaration is made that the "estimate" should be "only on the crude rock," and in either case that necessarily controls the meaning.

It will be observed that the word is "estimate," which, according to the established rule of 5 per cent. difference, could be made as well after as before the rock was dried. Besides, both the original and copy complaint, in setting out the condition of the bond, correspond in the statement that the said W. T. Seward & Co. "shall punctually pay the State treasurer at the end of each quarter the royalty provided by law to be paid thereon," which provides expressly that the "estimate shall be made only on the crude rock." The objection is obviously technical. The defendants must be taken to know the law. They had knowledge of the terms of the bond, and it is not claimed that they were misled by the omission of the two words in the copy of the condition.

Section 190 of the Code declares that "no variance between the allegation in a pleading and the proof shall be deemed material, unless it have actually misled the adverse party to his prejudice in maintaining his action or defence upon the merits. Whenever it shall be alleged that a party has been so misled, that fact shall be proved to the satisfaction of the court, &c. In *Ahrens* v. *State Bank* (3 S. C., 401), it was held that "under the Code, non-suit cannot be granted for a variance between the

allegations and the proofs. The only remedy is by amendment upon such terms as shall be just, as provided in section 192 (190), and to entitle himself to the remedy, the party prejudiced by the variance must satisfy the court immediately by affidavit that he has been misled, and in what respect he has been misled," &c. In 4 Wait Practice (630), it is said: "The policy of the legislature and the tendency of the decisions of the courts are in favor of simplifying the practice in legal proceedings as much as possible, and of disregarding the technicalities and matters of form, and especially so when it becomes necessary for the furtherance of justice to disregard mere technical errors. * * * An amendment may be made by inserting in the copy of the summons filed the names of defendants actually served with the summons, or who have appeared in the action. An omission to serve a copy of the complaint with the summons, or to state in the summons where such complaint is or will be filed, will not render the judgment void. Such an omission is a mere irregularity, which ought to be taken advantage of by motion, for the court will have acquired jurisdiction by the service of the summons, and may grant an amendment as to form," &c. We cannot doubt that the omission in the copy of the complaint of the words "and not" was a clerical error, not material in substance, and, therefore, a mere irregularity, which the judge was right in overruling as a ground for non-suit at the trial.

"Second. That it was error to admit in evidence the returns of Seward & Co. and the testimony of Mr. Roche, the officer representing the State, for the reason that the assignments of alleged breaches were defective, not being in the very words of the condition of the bond, therefore the evidence was irrelevant." There is here no allegation of discrepancy between the complaint filed and the copy served, but the objection, as we understand it, is that the testimony was inadmissible, for the reason that the assignment of breaches was defective in not denying all the requirements of the condition—"dug, mined, and removed and shipped," and therefore the evidence under these said assignments was not admissible, because "irrelevant." The question of the relevancy of testimony is necessarily left very much to the judgment of the trial judge.

37—33

But were the assignments of breaches in this complaint defective and insufficient? The terms of the condition were "dug, mined, and removed and shipped, or otherwise sent to the market." The paragraphs of the complaint, from six to twelve inclusive, state breaches substantially as follows, viz. : "That the said W. T. Seward & Co. did not pay to the said treasurer the royalty provided by law to be paid by them on phosphate rocks, &c., dug, mined, and removed by them, as aforesaid," &c. The words "and shipped" are omitted in assigning the breach ; but we incline to think that the assignment was sufficient. It was only necessary to negative clearly the very thing covenanted to be performed, and whether that was done was a matter of intention to be determined by construction. The assignment positively denied that Seward & Co. had paid the royalty on phosphates "dug, mined, and removed." Why was that not a breach well assigned? The word "removed" is quite as comprehensive as that of "shipped," which gives no new force to the sentence, but seems to have been added as a sort of legal tautology, only "to make assurance doubly sure." We do not understand that, according to the conditions of this bond, there could be no breach until the phosphates were not only "dug, mined, and removed," but also "shipped," in the sense of being actually placed on board of a vessel. If this were the proper construction of the bond. then the State could never recover anything from these parties, for the reason that the very "returns" of Seward & Co. state that they "removed" their phosphates by railroad, and it could not be averred that they had "shipped" them, unless in the sense of business men, when, in practical life, they say "shipped by rail," or "shipped by express," &c.

But if we pass over all the paragraphs indicated (from 6 to 12) without making any ruling on the point made as to them, we think there can be no doubt as to the sufficiency of the assignment of breaches in the fifth paragraph of the complaint, which is almost in the identical words of the bond, as follows, viz., "alleges that the condition of said bond has been broken ; that the said W. T. Seward & Co. did not make true and faithful returns to the comptroller general of the number of tons of phosphate rocks and phosphatic deposits by them dug, mined,

removed, or shipped, or otherwite sent to market, at the end of each month, and that they did not pay to the State treasurer at the end of each quarter the royalty provided by law to be paid thereon," &c. Is this not a good assignment of breaches? What does "thereon" refer to? Certainly the phosphates by them "dug, mined, removed, or shipped, or otherwise sent to market." These are the words *verbatim* of the bond, except that between the words "removed" and "shipped" the word "or" instead of "and" is used. The defendants say that, considering the connection, the word "and" made it necessary in every case to allege and prove that the phosphates were not only dug, mined, and removed, but also "shipped." We have just seen that it is at least doubtful whether this could have been the intention, if the word "shipped" is to be taken in its literal sense. It is true that "and" is a copulative conjunction and "or" is disjunctive; but if the word "or," which immediately precedes the word "shipped," disconnects it from the preceding sentence, the word "or," which immediately *succeeds that word*, must, by the same rule, *disconnect* it from the sentence which follows "or otherwise sent to market."

We think the fifth paragraph of the complaint assigns a good breach for not paying for phosphates "dug, mined, removed, or shipped, or otherwise sent to market"—that is to say, sent to market by *rail, wagon, lighter*, "*or otherwise ;*" and that there was no error in refusing to exclude the evidence on the ground that it was "irrelevant." There being pertinent and relevant testimony to go to the jury, it was not a case for non-suit. "When the declarations or admissions of the principal are made in the course of the performance of the business for which the surety is bound, so as to become part of the *res gestae*, they are evidence against the surety." Brant on Surety, 658, and authorities.

"Third. That his honor erred in charging the jury that the terms on the back of the license did not confine the liabilty of the defendants as sureties to a single quarter, but they were liable to the State for the amount due by their principal, provided that amount did not exceed the penalty of the bond ; while it is submitted that the rules of the department of agriculture formed

part of the contract between the State and the defendants, and limit their liability to the first quarter in arrear." This objection relates only to the amount recoverable, in effect admitting the liability of the sureties for the first quarter in arrear.

The judge charged "that the liability on the bond is to the extent of the royalty due, but not beyond the penalty of the bond, $5,000; therefore, if the undisputed testimony shows that there is as much as $5,000 due, you will find to that amount." Was this error? A copy of the rules and regulations of the department of agriculture was attached to the license to mine, one of which was as follows: "That in all cases where phosphate royalties [are] not promptly paid in the time provided by law, the license shall be suspended, and any mining done under the same after such suspension shall be considered and treated as illegal," &c. The bond had no attachment, and speaks for itself, but as it required the royalty to be paid quarterly, the defendants claimed that, upon the first default, the license should have been suspended; and that, as sureties, they are not liable for any default of their principal after that time. The aforesaid rules and regulations were attached to the license manifestly as information to Seward & Co. that in the case indicated the department retained the power to revoke the license, and thereby prevent any further mining under it. But we fail to see that the department, acting for the State, assumed any obligation to suspend a license on the very day default of payment may be made, or at any particular day. We think the right to suspend the license was retained by the department for the purpose of enforcing payment, and thereby protecting and securing the rights of the State; that the regulation was not mandatory, but merely directory. "Affirmative words make a statute directory and negtive or exclusive words make it imperative." *Attorney General v. Baker*, 9 Rich. Eq., 521.

Until the license was suspended Seward & Co. had the right to continue mining. The right to suspend constituted no part of the contract with either the principal or his sureties on the bond. As a matter of fact, the license was not suspended until about April 10, 1888, and there is no evidence that Seward & Co. mined any phosphates after that time. "If a statute is directory

as to the principal affected by it, it is equally so as to his sureties and those incidentally affected." Endl. Interp. Stat., § 431, and note; *Looney* v. *Hughes,* 30 Barb., 605. It is well settled that mere indulgence will not discharge a surety. In order to have that effect, there must be an agreement for indulgence between the creditor and principal debtor, obligatory on the creditor for a certain and definite period. *Witte* v. *Wolfe,* 16 S. C., 275, and authorities. We agree with the Circuit Judge, that within the penalty of the bond "the sureties are liable for all the shortcomings and defalcations of the principals."

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

In this case counsel for appellants filed their petition asking for a rehearing, alleging as grounds therefor, that the court had misconceived the proper meaning of the word "removed," which did not apply to rock "shipped, or otherwise sent to market," but only to the taking of rock from the stream where dug; that the court had overlooked the legal question raised by the exceptions, which alleged error to the Circuit Judge in charging that the treasurer's certificate showed an indebtedness of over seven thousand seven hundred dollars, whereas only a transcript from the treasurer's books, showing credits, would be sufficient to show a failure to comply with the conditions of the bond; that the additional penalty of suspending the license was not provided by statute, but only by contract, and therefore defendants were entitled to its protection; that the suspension of the license increased the liability of defendants; that the paper in suit was a penal bond, and not a negotiable security; and that this court had overlooked these points of law.

On this petition the following order was endorsed January 28, 1891:

PER CURIAM.—We have carefully examined this petition and do not find that the court has overlooked any material fact or important principle of law. It is therefore ordered, that this petition be dismissed.[1]

_____

[1] This completes the cases of April term, 1890.—REPORTER.